**KNOWLES ELECTRONICS and J. E. Bernard & Co., Inc.**

**v.**

**UNITED STATES.**

C.D. 4483; Court Nos. 69/1961–11965 and 70/45630–16523.

United States Customs Court.

Nov. 19, 1973.

(Joseph Schwartz, New York City, of counsel), for plaintiffs.

Irving Jaffe, Acting Asst. Atty. Gen., Martin L. Rothstein and Andrew P. Vance, trial attys., New York City, for defendant.

LANDIS, Judge:

These two cases, consolidated for trial without objection, involve merchandise imported from England and entered at Chicago in November 1966 (protest 69/1961) and November 1969 (protest 70/45630).

The imported merchandise is of three classes, viz: microphones, receivers, and coils which plaintiffs in their complaints (depending on the date of importation) claim are properly classifiable at 12 per centum and 9.5 per centum ad valorem as parts of hearing aids, dutiable under TSUS item 709.50, or alternatively (by amendment, without objection) at 11.5 per centum and 9 per centum ad valorem as electrical articles or electrical parts of articles, not specially provided for, under TSUS item 688.40.

The microphones and receivers (protest 69/1961) had been classified by customs at 15 per centum ad valorem under TSUS item 684.70 which provides for microphones, loudspeakers, headphones, and parts thereof.

The coils (protest 70/45630) were classified by customs as electrical goods (inductors), dutiable at 12 per centum ad valorem under TSUS item 682.60.

Defendant in its answer to the complaint has conceded that the receivers (BB–2511) are properly dutiable as parts of hearing aids under item 709.50, as claimed by plaintiffs and the protest of plaintiffs as to the receivers is therefore sustained.

This leaves before us for consideration two classes of the imported merchandise, viz: microphones and coils which, as above stated, plaintiffs claim are properly dutiable as parts of hearing aids under item 709.50 or alternatively as electrical articles or parts of articles,

Schwartz & Lidstrom and Barnes, Richardson & Colburn, New York City

not specially provided for, under item 688.40, rather than as microphones under item 684.70 and electrical goods (inductors) under item 682.60 as classified by customs.

The pertinent provisions of TSUS relative to the respective classifications made by customs and claimed by plaintiffs and the duty assessments are as follows:

*Classified*:

*Schedule 6.—Metals and Metal Products*

*Part 5.—Electrical Machinery and Equipment*

*Part 5 headnotes*:

1.  This part does not cover—

\*      \*      \*      \*      \*      \*      \*

    (vi) electrical instruments and apparatus provided for in schedule 7.[1]

Generators, motors, motor-generators, converters (rotary or static), transformers, rectifiers and rectifying apparatus, and inductors; all the foregoing which are electrical goods, and parts thereof:

\*      \*      \*      \*      \*      \*      \*

682.60  Other ............................... 12% ad val.

\*      \*      \*      \*      \*      \*      \*

684.70  Microphones; loudspeakers; headphones; audio-frequency electric amplifiers; electric sound amplifier sets comprised of the foregoing components; and parts of the foregoing articles (including microphone stands) ...................... 15% ad val.

*Claimed*:

*Schedule 7.—Specified Products; Miscellaneous and Nonenumerated Products*

*Part 2.—Optical Goods; Scientific and Professional Instruments; Watches, Clocks, and Timing Devices; Photographic Goods; Motion Pictures; Recordings and Recording Media*

\*      \*      \*      \*      \*      \*      \*

---

1.  As amended by the Tariff Schedules Technical Amendments Act of 1965, P.L. 89–241 § 36(f), 79 Stat. 933, 940 (1965), which deleted the words "and other electrical articles" from headnote 1(vi) as not to "preclude classification in such part 5 [schedule 6] of certain electrical 'parts' which would otherwise clearly fall within the specific provisions thereof. Headnote 1(vi) of part 5 is not intended to create an exception to general headnote 10(ij). \* \* \* in order to avoid possible conflict between such headnote provisions, it is proposed to delete the words 'and other electrical articles' from headnote 1(vi)." H.Rep.No.1728, 88th Cong., 2d Sess., at 24.

Subpart B.   Medical and Surgical In-
struments and Appara-
tus; X-Ray Apparatus

\*     \*     \*     \*     \*     \*     \*

709.50   Hearing aids and parts thereof ......... 12% ad val.
[1966 rate]
9.5% ad val.
[1969 rate]

*Schedule 6.—Metals and Metal Prod-
ucts*

*Part 5.—Electrical Machinery and
Equipment*

\*     \*     \*     \*     \*     \*     \*

688.40   Electrical articles, and electrical parts of
articles, not specifically provided for ... 11.5% ad val.
[1966 rate]
9% ad val.
[1969 rate]

———◆———

Both sides concede that the BA–2502 so-called microphones of protest 69/1961 are chiefly used as parts of hearing aids. Because microphones and coils are substantially different kinds of articles, the classification of each is best weighed and considered separately.

*Microphones*

As noted earlier, both sides have conceded that the imported BA–2502 microphones are chiefly used as parts of hearing aids. TSUS General Interpretative Rule 10(ij) provides as follows:

a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

Under rule 10(ij), the imported microphones are, therefore, provided for by item 709.50 as parts of hearing aids. The issue left open for discussion and decision is whether under rule 10(ij), the TSUS item 684.70 provision for microphones is a specific provision so as to include what the record establishes is the microphone part of a hearing aid. Plaintiffs' position on that issue, notwithstanding the entry invoice describes

the BA–2502 articles as microphones, boils down to the proposition that the articles here are not microphones in the tariff sense of the term and, in any case, are not microphones of the kind Congress contemplated in item 684.70.

Upon the record and arguments here made, I conclude that item 684.70 is, *inter alia*, a specific provision for "parts" which the record here establishes are microphones, and that plaintiffs have failed to overcome the presumptively correct classification as microphones under item 684.70.

From defendant's characterization of plaintiffs' statement of the record,[2] as "complete and fairly presented", I take it that there is no major dispute as to the facts appearing of record. It is sufficient for purposes of discussion here, therefore, to set forth the complete and fairly presented facts, included by plaintiffs in their digest of the record. Those facts are as follows:

Exhibit 1, representative of the imported microphones, is referred to by plaintiffs in their invoices and sales and technical literature as "microphones" or as "miniature magnetic microphones".

2.  The record consists of the testimony of five witnesses for plaintiffs, two witnesses for defendant, and 34 exhibits (17 for plaintiffs and 17 for defendant).

Such articles are also referred to as transducers, which is a broader term than is the term "microphones". The term "transducers" would also aptly include the BB–2511 receivers imported with the microphones. A microphone is technically (and narrowly) defined as a device for converting acoustical energy into electrical energy. The BA–2502 (exhibit 1) functions as a microphone. In contrast, a receiver such as the imported item BB–2511 functions as a receiver to convert electrical energy to acoustical energy. Normally transducers for hearing aids are specifically designed either for use as microphones (input transducers) or for use as receivers (output transducers). An input transducer technically fits the definition of a microphone.

The imported article, exhibit 1, is a microphone designed as an input transducer for a hearing aid. The similarities between the imported microphones and the imported receivers are greater than the dissimilarities and, as is the case with various types and sizes of microphones, subject to loss in efficiency, they are reversible, that is, the microphone is capable of converting electrical energy to acoustical energy and the receiver is capable of converting acoustical energy to electrical energy. Magnetic microphones, such as exhibit 1, are more efficient when reversed than are other types of microphones, and more frequently used in reverse applications than are other types of microphones that include moving coil or ribbon microphones, capacitance or electrostatic microphones, and piezoelectric microphones.[3]

One of plaintiffs' witnesses testified that to describe exhibit 1 as a microphone is inaccurate because if a person were to ask for a microphone in a commercial establishment that sold microphones he would not be offered an item of the kind represented by exhibit 1. Testimony of the same witness, to the effect that exhibit 1 was not a microphone because it lacked a "case", "a blast filter", "suspension" and "some means of terminating it" was rebutted by testimony of defendant's witness that exhibit 1 does have terminations and that a blast filter and a suspension and a case are not essential to a microphone.

To the extent that exhibit 1 can be used to perform functions other than converting acoustical energy into electrical energy, and has been used as an output transducer (receiver), it was the opinion of a witness for plaintiffs that exhibit 1 technically fits the definition of "transducer" but not that of "microphone". However, another witness for plaintiffs testified that function as a hearing aid microphone is far and away the most predominant application of exhibit 1. According to the witness 75 to 80 percent of the imported transducers were used as hearing aid microphones.

Defendant introduced testimony that Dyna Magnetic Devices, Inc., Hicksville, New York, the largest domestic manufacturer of input transducers of the kind represented by exhibit 1, describes its input transducers as microphones.

As part of its transducer line of products Dyna Magnetic Devices, Inc. also markets a miniature transducer for a helmet which picks up minute vibrations from the head and converts the mechanical energy or vibrations into electrical energy. The latter device is variously referred to as a "vibration pickup", a "vibration transducer", a "microphone", an "inertial microphone", or an "accelerometer". The helmet device does not, however, fit the technical definition of a microphone.

Plaintiffs contend that the imported microphones possess a "broader range of capabilities" than a microphone; that additional components must be added to the device to constitute it a microphone; that microphones are commercially sold as a self-contained unit; that the terminology in the industry of microphones is confusing and imprecise, and that exhib-

3. *Electrical Engineers' Handbook*, Pender-McIlwain, Communications-Electronics, 4th

ed. (New Hork: John Wiley & Sons, Inc.), at 13–22.

**1398**

it 1 itself is a potent witness to the fact that it is not a complete microphone.[4]

However, neither the facts heretofore alluded to nor plaintiffs' argument are, in my opinion, sufficient to support plaintiffs' contention that the articles they had invoiced as microphones are transducers rather than microphones.

In Midland International Corporation v. United States, 59 Cust.Ct. 523, 525, C.D. 3217 (1967), the court cited the following definition of the term "transducer":

> transducer, *n.* [L. *transducers* to lead across.] *Physics.* A device actuated by power from one system and supplying power in the same or any other form to a second system. For example, a telephone receiver is a transducer, actuated by electric power and supplying acoustic power to the surrounding air.

Devices that convert acoustical energy into electrical energy and electrical energy into acoustical energy are, as defined above, generically transducers. Most transducers are basically reversible.[5]

Microphones and loudspeakers, both *eo nomine* provided for in item 684.70, are generically transducers and both may be of a kind with reverse capabilities, i. e., convert acoustical energy into electrical energy or electrical energy into acoustical energy. See, Edo Commercial Corp. et al. v. United States, 65 Cust.Ct. 30, 34, C.D. 4049 (1970). The rationale of the *Edo* case, which involved a classification and claim the reverse of that in this case, strikes me as very much in point on the classification of the "microphones" under item 684.70 in this case.

The merchandise in *Edo* consisted of articles known as transducers. Customs classified the transducers as parts of ships' depth-sounding instruments and apparatus (plaintiffs' claim here is as parts of hearing aids). *Edo* claimed that the transducers were specifically provided for as microphones under item 684.70 and should, per force, General Interpretative Rule 10(ij), be classified as microphones. (The *Edo* claim is the essence of defendant's classification in this case.) The *Edo* transducer operated through piezoelectric activity and was reversible which, as explained in the opinion decision, meant that not only could it convert electrical energy into sound energy but it also could perform the reverse function of reconverting sound energy into electrical energy. Concluding "that a microphone in its common meaning is an instrument or device which converts sound waves into electrical signals for further transmission", the Customs Court discussed and overruled the *Edo* claim that the depth-sounding device was a microphone in the following context:

> Coming now to the present case, the primary function of the transducer is not to convert sound to electricity or to convert electricity to sound. Rather, it has two coequal functions: the conversion of electricity to sound and the reconversion of sound to electricity so that it is more than a microphone and, for that matter, more than a loudspeaker. And where an article "has two functions which are coequal, the article cannot be classed as one or the other." Gallagher & Ascher Company v. United States, 63 Cust.Ct. 223, 226–7, C.D. 3899 (1969). See also V. Alexander & Company, Inc. v. United States, 59 Cust.Ct. 510, C.D. 3212, 276 F.Supp. 573 (1967); Castelazo & Associates et al. v. United States, 61 Cust.Ct. 391, C.D. 3639, 294 F.Supp. 81 (1968).

> Beyond this, there are several other reasons why the claim lacks merit. As we have seen, it is plaintiffs' position that piezoelectric instruments which are capable of converting electricity into sound and vice versa constitute microphones. Were that position to be accepted, it would necessarily follow that since all piezoelectric instru-

---

4. Exhibit 1 is a tiny square metal encased device measuring approximately $\frac{5}{16}''$ by $\frac{5}{16}''$.

5. Edo Commercial Corp. et al. v. United States, 65 Cust.Ct. 30, 33 (footnote 5), C.D. 4049 (1970).

ments have reversible capabilities, they would have to be classified as microphones. But such a result would be clearly inconsistent with the Explanatory Notes to heading 85.14 of the *Brussels Nomenclature* which—as previously discussed—make a clear distinction—based on function—as between piezoelectric microphones and piezoelectric loudspeakers. Acceptance of plaintiffs' position would, in addition, make a nullity of the *Brussels Nomenclature's* Explanatory Note provision for piezoelectric loudspeakers since, under plaintiffs' reasoning, such loudspeakers would be classifiable as microphones. Moreover, considering that the transducer converts electric energy into sound energy and vice versa, it would be just as logical, under plaintiffs' rationale, to classify the transducer as a piezoelectric loudspeaker as it would be to classify it as a piezoelectric microphone. [65 Cust. Ct. at 34–35.]

The rationale of the *Edo* case persuasively explains that transducers, chiefly used as a part of an article, are classifiable according to the *primary function* they are designed to perform in the article of which they are a part. "Where the *primary function* of the * * * [transducer] is to convert sound to electricity, it constitutes a * * * *micro-*

*phone."* (Emphasis quoted.) The transducer in the *Edo* case, since it performed the co-equal functions of converting electricity to sound and sound to electricity, was held to be more than a microphone and, therefore, properly dutiable as a part of a ship's depth-sounding apparatus, as classified by customs. The record here, which establishes that the primary function of the imported input transducers [microphones], chiefly used in hearing aids, is to convert acoustical energy into electrical energy, supports the presumption of correctness attaching to the customers classification under item 684.70 as microphones.

The speciousness of plaintiffs' contention dealt with above comes through plainly upon a consideration of plaintiffs' additional contention that "since the article [imported microphones] may be said to be described in two or more provisions of the schedules [item 684.70 as microphones, and item 709.50 as parts of hearing aids], it is [pursuant to TSUS General Interpretative Rule 10(c)] [6] classifiable under the provision which more specifically describes it." (Plaintiffs' main brief at 33.) The cases cited by plaintiffs did not involve or suggest that the term "microphones" in item 684.70 is a less specific provision for the microphone part of a hearing aid.[7] It cannot be de-

6. Rule 10(c) provides as follows:

(c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it; but, in applying this rule of interpretation, the following considerations shall govern:

(i) a superior heading cannot be enlarged by inferior headings indented under it but can be limited thereby;

(ii) comparisons are to be made only between provisions of coordinate or equal status, i. e., between the primary or main superior headings of the schedules or between coordinate inferior headings which are subordinate to the same superior heading.

7. Vilem B. Haan et al. v. United States, 67 Cust.Ct. 104, C.D. 4260, 332 F.Supp. 182 (1971) (the term "cushion" does not include the seat headrest part of an auto); United States v. Andrew Fisher Cycle Co., Inc., 57

CCPA 102, C.A.D. 986, 426 F.2d 1308 (1970) (the term "saddles" does not include the bicycle seat part of a bicycle); Midland International Corporation v. United States, 62 Cust.Ct. 164, C.D. 3715, 295 F.Supp. 1101 (1969) (the term "plugs" intended to cover those for use in electrical power circuits does not include articles for low current or audio circuits); United States v. Ampex Corp. et al., 59 CCPA 134, C.A.D. 1054 (1972) (tariff provision for "insulated electrical conductors" is more specific than tariff provision for "television apparatus"); Arthur J. Humphreys et al. v. United States, 56 CCPA 67, C.A.D. 956, 407 F.2d 417 (1969) (the term "furniture" is not a specific provision for the furniture part of a radio-phonograph combination); Wilfred Schade & Co., Inc., etc. v. United States, 62 Cust.Ct. 138, C.D. 3701, 295 F.Supp. 1117 (1969) (the term "molds" is a specific provision for molds that are parts of casting machines).

nied that in enacting item 684.70 Congress intended to establish, *inter alia*, a dutiable provision for microphones. In the light of the narrowly understood common meaning of the term "microphone", Edo Commercial Corp. et al. v. United States, *supra*, the congressional use of the term is, in my opinion, sufficiently specific to include the "microphone" part of a hearing aid. Cf. Robert Bosch Corp., Arthur J. Fritz et al. v. United States, 63 Cust.Ct. 187, 191, C.D. 3895, 305 F.Supp. 921 (1969).

■ The amendment of the part 5, schedule 6 headnote quoted, *supra*, the stated purpose of which was not "to preclude classification in such part 5 of certain electrical 'parts' which would otherwise clearly fall within the specific provisions thereof", supports my conclusion that the term "microphones" is a specific provision for the microphone part of an article.[8] Plaintiffs' reliance on interpretative rule 10(c) (the rule of relative specificity) does not call for a different result. The essence of the rule is that where two tariff provisions provide for an article, the more specific provision is the one having requirements which are more difficult to satisfy. United States, etc. v. Simon Saw & Steel Company, 51 CCPA 33, 40, C.A.D. 834 (1964). "While a 'parts' provision is not exactly a 'basket' provision, there is an analogy in that it necessarily includes a number of unnamed parts", United States v. Andrew Fisher Cycle Co., Inc., 57 CCPA 102, 106, C.A.D. 986 (1970). TSUS item 709.50 classifying hearings aids and parts thereof necessarily includes, in a basket fashion, unnamed parts that perform diverse functions in various kinds of hearing aids. The term "microphone" limited as it is to devices that, whatever their form, convert

acoustical energy to electrical energy, is more difficult to satisfy. Compare, United States v. Ampex Corp. et al., 59 CCPA 134, C.A.D. 1054 (1972). The statement in Arthur J. Humphreys et al. v. United States, 56 CCPA 67, 71, C.A.D. 956, 407 F.2d 417 (1969), one of the cases relied on by plaintiffs, that the tariff provision for "parts of radio-phonograph combinations" involved requirements more difficult to satisfy than the tariff provision for "furniture" does not presage a different approach. The statement must first be read in the context that it was directed to appellants' argument and not purely to the question of relative specificity. It is best understood in the context of what the court of appeals opinion decision next went on to state, namely, that:

> \* \* \* So far as general headnote 10(ij) is concerned, we do not think that item 727.35 [furniture] constitutes a "specific provision" for the [furniture] parts of a radio-phonograph combination \* \* \*.

■ Plaintiff cites no direct legislative history and I can find none, which supports its stated view that the imported microphones are not the class or kind Congress intended to classify in TSUS item 684.70. Where there is nothing to indicate what Congress intended a tariff term to mean, then the term must be read and understood in accord with the common meaning, Brown Boveri Corp. et al. v. United States, 53 CCPA 19, 23, C.A.D. 870 (1966). The record does not factually support, and it is not as apparent, as plaintiffs make out, that hearing aids are nothing more or less than electric sound amplifier sets classified under item 684.70. If they are, the fact that hearing aids would be classified as hearing aids under item 709.50, rather than

---

8. Plaintiffs' attempt, in a footnote at page 37 of their brief, to draw significance from the fact that an extraneous headnote, to wit, schedule 7, part 2, subpart F has an exclusionary clause whereas schedule 7, part 2, subpart B does not, is entirely without merit. No point has been made as to the absence of an exclusionary clause in schedule 7, part 2, subpart B. The schedule 6, part 5 headnote, as discussed herein, on the other hand, indicates a clear legislative intent that parts of electrical articles provided for in schedule 7, pursuant to General Interpretative Rule 10(ij), remain classified in schedule 6 if specifically provided for in schedule 6.

as electric sound amplifier sets under item 684.70, does not demonstrate the fallacy of classifying the microphone part of a hearing aid as a microphone under item 684.70, as directed by Congress in interpretative rule 10(ij).

■ Defendant's admission that the BB–2511 receivers are parts of hearing aids is not inconsistent with defendant's classification of the BA–2502 device as a microphone. It does no good to argue that receivers are loudspeakers and next ask why defendant did not classify the receivers as loudspeakers. There is not an iota of proof that the BB–2511 receivers are loudspeakers, and argument is not a substitute for proof. As previously stated, for the reasons stated herein plaintiffs' claim that the invoice BA–2502 devices are properly classifia-

ble as parts of hearing aids under item 709.50 is overruled.

### Coils

■ The coils subject of protest 70/45630, designated on the invoice part of the official papers as BJ–50, BC–55, and BC–54 coils, were entered for the account of Knowles Electronics under TSUS item 682.60 which, *inter alia*, provides for inductors that are electrical goods. Plaintiffs' complaint, as previously stated, alleges that the coils are parts of hearing aids and should be so classified under item 709.50. Defendant denies that the coils are classifiable as parts of hearing aids and avers that the coils are inductors dutiable as classified and entered under item 682.60. TSUS item 682.60, as noted earlier, provides as follows:

Generators, motors, motor-generators, converters (rotary or static), transformers, rectifiers and rectifying apparatus, and inductors; all the foregoing which are electrical goods, and parts thereof:

    \*  \*  \*  \*  \*  \*  \*

682.60  Other ............................... [9]

———◆———

Exhibit 2 is representative of the BJ–50 coil. Exhibits 3 and 4 are representative of the BC–55 and BC–54 coils. The three exhibits are tiny miniature size coils of undisclosed dimension. No one has deigned to question and the testimonial record attests that the coils are electrical goods imported for use with miniature magnetic transducers (i. e., microphones and receivers) that are concededly parts of hearing aids. Notwithstanding the imported electrical goods are imported as and sold as "coils", the issue raised by the complaint is whether the coils are in fact inductors. There is no proof that the tariff term "inductors" is a commercial desig-

nation of any sort. The factual issue must, therefore, be weighed and determined according to the common meaning of the term "inductors". Brown Boveri Corp. et al. v. United States, 53 CCPA 19, 23, C.A.D. 870 (1966).

The witnesses for both sides, who gave their opinions as to the common meaning of the term "inductors", substantially agree that by definition an inductor is "a device for introducing inductance into a [electric] circuit" and that the "term covers devices with a wide range of uses, sizes, and types, including components for electric-wave filters, tuned circuits, electrical measuring

---

9. Compare, Brussels Nomenclature heading 85.01, *Explanatory Notes to the Brussels Nomenclature* (1955), Vol. III, at 925.
85.01—ELECTRICAL GOODS OF THE FOLLOWING DESCRIPTIONS: GENERATORS, MOTORS, CONVERTERS (ROTARY OR STATIC), TRANSFORMERS, RECTIFIERS AND RECTIFYING APPARATUS, INDUCTORS.

circuits, and energy storage devices." [10] It is also agreed that inductance is commonly understood to mean that "property of an electric circuit or of two neighboring circuits whereby an electromotive force is induced (by the process of electromagnetic induction) in one of the circuits by a change of current in either of them."[11]

Plaintiffs conclude that the preponderance[12] of the evidence in this record establishes that "the coils are not inductors of any kind; and assuredly not the inductors contemplated by Congress in item 682.60" (plaintiffs' main brief, page 52). Defendant, in opposition, starts with the accepted assumption that the customs classification as inductors is presumptively correct. Hayes-Sammons Chemical Co. v. United States, 55 CCPA 69, 72, C.A.D. 935 (1968). Off that, it is defendant's position that plaintiffs' evidence is insuffi-

cient to overcome the presumption that the imported coils belong to a class or kind of electrical goods chiefly used for introducing inductance into the electrical circuit; that the coils must, therefore, be considered inductors within the common meaning of the term connoting use; and that tariff designations by use, as a matter of law, mean chief use.[13] Defendant, however, has cited no authority which holds that a description in TSUS connoting use is a classification by chief use. I have no reason to doubt that "[o]f all things most likely to help in the determination of the identity * * * [of the imported coils], beyond the appearance factors of size, shape, construction and the like, use [as the common meaning of the term "inductors" implies] is of paramount importance." The real problem in this case, however, when considering all those elements, is simply whether the

10. *Inductor*
A device for introducing inductance into a circuit. The term covers devices with a wide range of uses, sizes, and types, including components for electric-wave filters, tuned circuits, electrical measuring circuits, and energy storage devices.
Inductors are classified as fixed, adjustable, and variable. All are made either with or without magnetic cores. Inductors without magnetic cores are called air-core coils although the actual core material may be a ceramic, a plastic, or some other nonmagnetic material. Inductors with magnetic cores are called iron-core coils. A wide variety of magnetic materials is used and some of these contain very little iron. Magnetic cores for inductors for low-frequency, or high-energy storage, use are most commonly made from laminations of silicon steel. Some iron-core inductors with cores of compressed powdered iron, powdered permalloy, or ferrite are more suitable for higher-frequency applications. [*McGraw-Hill Encyclopedia of Science and Technology*, Vol. 7, at 80 (1966).]
The term "inductor", as used in Brussels Nomenclature heading 85.01, quoted in footnote 9, carries the same meaning, explained as follows:
(VI) INDUCTORS (e. g., REACTORS AND CHOKES)

These consist essentially of a single coil of wire which, inserted in an A.C. circuit, limits or prevents by its self-induction the flow of the A.C. They vary from small chokes used in wireless circuits, instruments, etc., to large coils often mounted in concrete, used in power circuits (e. g., for limiting the flow of current in the event of a short circuit). [*Explanatory Notes to the Brussels Nomenclature* (1955), Vol. III, at 928.]

11. *McGraw-Hill Encyclopedia of Science and Technology*, Vol. 7, at 65 (1966).

12. PREPONDERANCE. This word means more than "weight;" it denotes a superiority of weight, or outweighing. The words are not synonymous, but substantially different. There is generally a "weight" of evidence on each side in case of contested facts. But * * * [the court] cannot properly act upon the weight of evidence, in favor of the one having the *onus*, unless it overbear, in some degree, the weight upon the other side, not necessarily *in quantity*, but in effect. * * * [Emphasis added in part. Black's Law Dictionary, 3d ed. (1933), at 1404.]

13. TSUS, General Interpretative Rule 10(e) (i).

imported coils are in fact "inductors". United States v. Quon Quon Company, 46 CCPA 70, 73, C.A.D. 699 (1959).

It is true plaintiffs' witnesses testified that the imported coils were not known or sold as inductors. They further stated that in designing the imported coils for miniature input and output transducers, the principal consideration was the physical characteristics of the coils, namely, size, shape, and number of turns, to meet a particular performance function in the transducer. In the opinion of plaintiffs' witnesses, inductance is the secondary and unavoidable by-product of the other physical characteristics for which the coils are designed. The coils do, of course, possess physical characteristics of size and shape necessary for their use in miniature transducers. Concern for the physical characteristics of the imported coils, which exists in the manufacture of most precision tooled products designed to perform a particular function, does not, however, in my opinion, carry much weight with respect to the proper classification of the imported coils. I discount that as a consideration in the light of the common meaning of the term "inductors". Nothing in the common meaning of the term refers to the physical characteristics of inductors, which are devices having the property in an electric circuit to induce an electromotive force in the circuit.

In short, the evidence does preponderantly establish that the imported coils are manufactured to exacting design specifications; that the imported coils are not made to any specific level of inductance; that the inductance of the coil is secondary to the design considerations, and that the imported coils are dealt with in the trade[14] as "coils" rather than as "inductors". The sum of that evidence, however, is not sufficiently relevant to overcome the presumption that the coils, in the manner of their use and application in miniature magnetic transducers, are inductors within the common meaning of the term. To the contrary, as I suggested earlier, the evidence of how the coils function in transducers tends to support the classification of these imported coils as inductors.

Plaintiffs' witnesses testified to the use and function of the imported coils in miniature magnetic transducers[15] and flatly opined that the imported coils were not inductors. But their opinions, as mentioned earlier, were preponderantly based on facts too inconclusive to establish that the coils were not inductors in the common meaning of the tariff term. The lack of concern for the property of inductance in the coils, constantly adverted to in the testimony, in my opinion, is quite immaterial since the inductance native in the coils is not established to be insufficient for application in miniature magnetic transducers. Plaintiffs' witnesses also testified that the function of the coils involved a process of induction which they said was not inductance. Such testimony, in my opinion, does no more than suggest a possible distinction which, for all that is said, may be a distinction without a difference.

14. No issue of "commercial designation" has been raised by plaintiffs or argued.

15. On direct examination the witnesses substantively testified as follows:
* * * the coil is a portion of the transducer which is basically involved in converting a magnetic change in the transducer to an electrical change, in one form or another; or, conversely, converting an input electrical change into a magnetic change in the transducer. * * * [R. 21.]
* * * * *
* * * the coil is connected to an amplifier in a hearing aid; the amplifier delivers electrical energy to the coil; the coil transforms this, or transduces this into magnetic energy, which is then used to perform a mechanical function in the receiver, which moves a diaphragm, which produces acoustic energy. [R. 23.]
* * * * *
The purpose of devices of these coils is to transfer electrical energy into magnetic energy in necessary transducers, and then the magnetic energy is converted into mechanical energy which is, in turn, converted into acoustical energy or vice-versa. [R. 80.]

One of plaintiffs' witnesses testified that the induction process he described was different from inductance as defined by McGraw-Hill,[16] for the reason that there was no current creating the magnetic field. (R. 90.) Weighing the testimony of plaintiffs' witnesses on cross-examination, however, it is apparent that while they were inclined to equivocate, they were unable to deny that the imported coils have the property of inductance and that the manner in which the imported coils function in miniature magnetic transducers is a process of induction.[17]

Thus, notwithstanding plaintiffs' witnesses were of the opinion that the coils were not inductors, their explanation of

---

16. See, op. cit. n. 11.

17. On cross-examination plaintiffs' witnesses testified as follows:

Q. Isn't it a fact that those coils lend inductance to the circuit in the application in Knowles transducers, as that term is defined in the McGraw-Hill publication which I just cited to you?—A. I don't think I understand what you mean by "lend inductance to a device."

It is possible to measure the property of inductance on either the coil or the transducer, with electrical instrumentation, so the devices have a property which can be called "inductance," which can be measured as inductance.

Q. You say the coil in the transducer does have a property of inductance?—A. Yes, it does.

Q. Is that your testimony?—A. Yes.

Q. Would the transducer be able to function as a transducer if that coil did not have a property of inductance?—A. I can't answer that directly, because the property of inductance is, comes along as a secondary characteristic in the transducer. It is not something that we either design for or, in fact, even measure in in any of our applications.

Q. I asked you whether the feature of inductance, which you say the coil has, is necessary to the operation of the transducer, and whether the transducer could operate without the inductance of the coil. I think that calls for a "yes" or "no" answer, and you can explain your answer if you so desire. I did not ask you whether it was designed for that purpose.—A. Because of the physical nature of the device, inductance is a part of functioning of the transducer.

Q. Then it is necessary to the functioning of the transducer, is it not?—A. It is necessary in the sense that it is a by-product of something else for which we design, and that is a number of turns in a physical configuration which produces the inductance, as you are referring to it here.

Q. So, to sum up what you are saying, the coil does have an inductive property, and that inductive property is necessary to the proper function of the Knowles transducer; is that a correct statement of your testimony?—A. Well, the term "necessary" I think is what bothers me, because the inductance of the coil, I can't consider to be necessary. However, as a function of other things which are necessary, it is there. The fact that we have wire in the device, and the wire is coiled and it is used as a transduction between changing magnetic force and electrical output, in this particular case the inductance is there.

I, I hesitate to say it's necessary. It is there, and you can't get rid of it without destroying the other physical properties, electronic properties. [R. 65–68.]

*       *       *       *       *

Q. How does that definition [inductance], or how does that process described in the definition, differ from the function of the coil in the transducer which you designed? —A. The coil in the transducer, when used as a receiver, induces a magnetic field in the armature; when a current is passed through the coil of the receiver, the current induces a magnetic field in the armature which moves, causes the armature to move, which causes the diaphragm to move, which causes an acoustical output.

In the case of a microphone, the diaphragm causes an armature to move, which disturbs a magnetic field. This magnetic field induces a voltage in the coil, producing an output.

Q. The voltage is then induced in the coil?—A. The voltage is induced in the coil by the motion of the magnetic field.

Q. And you say this is different than electro-magnetic induction?—A. That is different from the McGraw-Hill definition of magnetic induction.

Q. In what way?—A. There was no current creating the magnetic field. [R. 89–90.]

*       *       *       *       *

Q. Referring to your testimony concerning the coils, Mr. Apel: As an electrical engineer, can you state whether or not these coils have the property of inductance, as used in the Knowles transducers?—A. There's no getting away from that, the answer to your question is yes—but I would point out that even a straight piece of wire has inductance.

Q. Would you explain why it is that the coils have inductance, as used in the Knowles application?—A. Why?

Q. Why? Would you explain it in electrical terms.—A. Any conductor has inductance.

Q. I am referring specifically to the coils themselves.

You can explain in fairly simple electrical terms the nature of this inductance: what it means; how it comes about; and how it relates to the rest of the circuit in the transducer.

A. Well, inductance is a physical property, like resistance to a resistor, and such things as this. The utility of inductance in a circuit, in an electronic circuit, can be used to do such things as tune a radio—you can match it up with a capacitor. But, in our particular unit, we do not use the inductance, per se.

Q. First of all, I was asking you not what use you made of the inductance at this point, but I was asking you to explain, number one, what you mean by inductance in this sense; and, number two, how that inductance comes about—in very simple electrical terms; in terms of the structure configuration of the components of the transducer.—A. You are looking for a definition of the property of inductance.

Q. And an application of that definition to the transducer which is at issue here.—A. I don't know of the—well, let's answer the questions one at a time.

Inductance is that property of electricity of a coil of wire, or of a conductor, in which energy is stored in a magnetic field. Now, we do not use specifically the property of inductance in our transducers. Now, we use the process of induction in our transducers, but not inductance.

Q. Would you explain how the transducer utilizes the function of induction?—A. Well, in the case of a receiver what we do with the coil is pass a current through it which causes a magnetic flux to be built up in the assembly. In the case of a microphone, it is a passive device with the magnetic field already existing, and deflection of a portion of the magnetic field causing variations in the magnetic flux lines which generate a voltage in the coil.

Q. Would the process you have just described be describable as the property of an electric circuit or of two neighboring circuits whereby an electro-motive force is induced by the process of electro-magnetic induction in one of the circuits by a change of current in either of them?—

Isn't that what you exactly described in answer to my last question?—A. Not really. What you have ahold of there is, I would have to sit down and study it carefully, but you have two terms mixed up: you

have "inductance," and "mutual inductance." When you talk about two coils, or neighboring inductance, you are talking about the mutual inductance between them, in which a voltage is generated in the second one because of the flow of current in the first one.

Now, we do not have two coils; we have a single coil in our unit. So, I'd say that definition does not apply.

Q. Well, do you have two neighboring electrical circuits?—A. No.

Q. There's only one electrical circuit?—A. That's right.

Q. Can the relationship of the coil and the armature in the Knowles transducer be regarded as two electrical circuits?—A. Not really. One is an electrical circuit; the other is a magnetic circuit.

The coil is—because of the passage of current through the coil, you are inducing a magnetic field in a magnetic structure, and yet you actually take pains to minimize the flow of current, electrical current, through that other circuit.

Q. Could the Knowles transducer, the BA2502, function without the property of inductance which you stated that the coil possesses?—A. In that it's physically impossible to make a coil without the property of inductance, the answer is no.

See, inductance is something that comes along as an extra thing; we don't want it.

Q. Would it be possible to use that same coil that I am referring to, Plaintiffs' Exhibits 2, 3, and 4, in another use, or in another electrical article, in which the character of the property of inductance would be both necessary and desirable to the function of that article?—A. Yes, it would, but this would be a bastardization, and you would be paying a price premium.

Q. What do you mean by "a bastardization"?—A. Because you can get an inductor with the inductance of this unit much more readily and more cheaply on a mass produced basis.

Q. In other words, are you saying purely because of the physical, the rigid physical specifications to which these things were designed, it would not be necessary; that that would be wasteful?—A. Very definitely. You could take a piece of wire and wrap it around a wooden pencil and get the inductance that you are looking for in our coil.

Q. In any event, you say that these articles could be used in other applications, though it might be wasteful, and that in those applications they would have the function of inductors.—A. Oh, yes. No question about it—but it would be a very strange use.

Q. Well, would you agree then that articles of the same general class and kind and structure, but not designed to the rigid specifications of size necessary for hearing aids,

the function of the coils in miniature magnetic transducers strongly supports that the coils do function to assist in the conversion of energy by inductance. The classification of the coils as inductors is presumed to include each and every fact necessary to support the classification, E. I. du pont de Nemours & Co. v. United States, 27 CCPA 146, 149, C. A.D. 75 (1939), and the explanation of the function of the coils appears to involve electromagnetic induction which, as discussed in the *McGraw-Hill Encyclopedia of Science and Technology*, Vol. 7, at 69, is:

> The production of an electromotive force either by motion of a conductor through a magnetic field in such a manner as to cut across the magnetic flux or by a change in the magnetic flux that threads a conductor.

The customs classification is further supported by the opinion of defendant's witness,[18] who testified that the coils are inductors and explained in fuller detail than did plaintiffs' witnesses the manner in which the coils function as inductors in miniature magnetic transducers to produce an electromotive force.

Plaintiffs further contend that if the coils are considered, *arguendo*, inductors, they are not the type of inductors contemplated by classifying item 682.60. As plaintiffs read the item and the witnesses when asked agreed, the articles specified therein, namely, generators, motors, motor-generators, converters, transformers, rectifiers and rectifying apparatus, connote power generating and power distribution equipment. The point plaintiffs make of such analysis is that the imported coils do not have the power handling capabilities of the other articles in item 682.60 and consequently item 682.60 should not be read to include coils or inductors designed to handle only low voltage current, citing in support, United States v. General Electric Co., 58 CCPA 152, C.A.D. 1021, 441 F.2d 1186 (1971), and Midland International Corporation v. United States, 62 Cust.Ct. 164, C.D. 3715, 295 F.Supp. 1101 (1969). Those cases might help plaintiffs if the history and logic of the classifying provision, as it did in those cases, supported plaintiffs' attempt to distinguish between high and low power electrical goods. But electrical power connotes energy whether it be high power energy or low power energy. TSUS item 682.60 imposes no limitation on the amount of energy involved in the application of the article specified and that, itself, is enough to foreclose plaintiffs' argument that it does. United States v. Ampex Corp. et al., 59 CCPA 134, C.A. D. 1054 (1972).[19] If there is a common denominator that exemplifies the articles specified in item 682.60, it is that

---

could be used in applications to provide inductance and to, in fact, serve as inductors?—A. You sort of lost me there. If you are saying that if you make a coil and sell it as an inductor, you are right, yes.

Is that what you said? I—I got lost.

Q. Well, I asked if articles of the same general class or kind as Plaintiffs' Exhibit 4 could be used as inductors?—A. Oh, very definitely. No question about it.

Q. And if they were not designed to the same rigid hearing aid specifications, then that would not be a wasteful application, would it?—A. No.

Q. The waste involved would be in using this particular one, because it happens to be of a particular dimension.—A. That's right.

Q. For hearing aids.—A. And this is really—this is beside the point, but this is where our cost is, in building it a certain way.

Q. So the only thing that makes this unique is that it is designed to be squeezed into a hearing aid?—A. Into a transducer.

Q. Excuse me. Into a transducer.—A. Yes. And it's designed as part of a mechanical design in a transducer assembly. [R. 109–116.]

18. Ronald W. Keipper, graduate engineer, and vice-president of Wabash Magnetics, Inc., Wabash, Indiana, which he testified is the largest independent manufacturer in the United States of electrical components, including transformers, chokes, filters, and coils.

19. See also, op. cit. n. 9 re Brussels Nomenclature heading 85.01.

they are all articles that have to do with the conversion of energy.[20]

Plaintiffs having failed to overcome the presumption attaching to the classification of the imported merchandise as microphones and inductors, the claim for classification under the item 688.40 basket provision for electrical articles and electrical parts of articles, not specially provided for, need not be considered.

Protest 69/1961 is sustained with respect to the BB–2511 receivers and overruled with respect to the BA–2502 microphones, and protest 70/45630 (coils BJ–50, BC–55, and BC–54) is overruled.

Judgment will be entered accordingly.

---

**20.** See, Summaries of Trade and Tariff Information (1969), Schedule 6, Vol. 10, at 129–131.